# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

DAVID ELI FLOREZ,

      Plaintiff,

      vs.                                Civ. No. 19-663 KK

ANDREW SAUL, Commissioner of the
Social Security Administration,

      Defendant.

## MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court on Plaintiff David Eli Florez's ("Mr. Florez") Motion to Reverse and Remand for Rehearing, with Supporting Memorandum (Doc. 21) ("Motion"), filed January 21, 2020, seeking review of the unfavorable decision of Defendant Andrew Saul, Commissioner of the Social Security Administration ("Commissioner"), on Mr. Florez's claim for Title II disability insurance benefits ("DIB") under 42 U.S.C. §§ 405(g) and 1383(c)(3). The Commissioner filed a response in opposition to the Motion on April 20, 2020 (Doc. 24), and Mr. Florez filed a reply in support of the Motion on May 7, 2020.  (Doc. 25.)  Having meticulously reviewed the entire record and the applicable law and being otherwise fully advised in the premises, the Court FINDS that Mr. Florez's Motion is well taken and should be GRANTED.

## I.  Background

Mr. Florez is a former construction laborer who has a ninth-grade education and no reported earnings since 2010. (Administrative Record ("AR") 041-43, 194, 196.) He filed his claim for DIB on May 26, 2016, indicating an alleged onset date ("AOD") of disability of March 15, 2010 due to lower back pain, arthritis, diabetes (type 2), high blood pressure, depression, heart murmur, shortness of breath, and dizziness. (AR 185, 218.) In a pre-hearing memorandum

submitted by his attorney on June 22, 2018, he amended his AOD to May 25, 2015. (AR 290.) His

date of last insured ("DLI") was December 31, 2015, at which time he was fifty-five years old.

(AR 012.)

**Physical Impairments Evidence[1]**

Mr. Florez fell off a scaffold in 2006 and injured his back but did not initially have

"significant pain" and self-treated with ibuprofen for many years. (*See* AR 044, 332, 341.) In

December 2014 when he complained of chronic sciatic type pain, his medical provider ordered x-

rays which showed L4-L5 and L5-S1 interspace narrowing.[2] (AR 325.) In August 2015, he was in

a low-speed motorcycle accident and broke a rib. (AR 293.) Three days after the accident, he

complained of left leg pain to his primary care provider, Sasha Sokolowski, PA. (AR 323.) PA

Sokolowski ordered x-rays of Mr. Florez's leg, demonstrated stretches to help alleviate his back

pain, and referred Mr. Florez to the Presbyterian Pain and Spine Center. (AR 325.)

Mr. Florez established care at the Pain and Spine Center in October 2015. (AR 341.)

Gregory Maroney, PA, noted that Mr. Florez's lower back pain was a "chronic problem" and

documented that "[t]he current episode started more than 1 year ago." (AR 342.) Mr. Florez

described the quality of his pain as "stabbing and aching" and explained that "stiffness" was his

worst symptom that was "present all day." (AR 342.) Based on x-rays taken at that time, PA

Maroney noted impressions of "considerable narrowing of the L5-S1 interspace, moderate

narrowing of the L4-5 interspace, and mild narrowing of the other lumbar interspaces." (AR 435,

442-44.) Mr. Florez was diagnosed with lumbar facet arthropathy and degeneration of lumbar or

---

[1] Mr. Florez does not challenge the ALJ's findings regarding his physical impairments. However, the Court includes a brief discussion of the evidence related to Mr. Florez's physical impairments to provide context for its analysis of Mr. Florez's challenge to the ALJ's handling of his mental impairments, specifically Mr. Florez's depression, which was believed to be precipitated, at least in part, by his physical conditions. (*See* AR 868.)

[2] For reasons that are unclear, Mr. Florez did not receive the results of his December 2014 x-rays until August 2015. (AR 325.)

lumbosacral intervertebral disc and referred to physical therapy. (AR 434.) He declined a prescription for pain medication but agreed to take a muscle relaxer. (AR 434-35.) In February 2016, he reported that his pain was "stable" (AR 534), but in August 2016 he complained of worsening pain. (AR 566.) PA Maroney recommended injections, but Mr. Florez was not eligible to be treated with injections at that time due to his uncontrolled diabetes. (AR 565-66.) Instead, Mr. Florez continued taking a muscle relaxer and began taking codeine for his pain. (AR 564-65.)

**Mental Impairments Evidence**

In October 2014, Mr. Florez reported to Kenneth Yamamoto, M.D., his primary care physician, that he was experiencing "[i]ntermittent mild depression since [the] death of [his] father several years ago[.]" (AR 338.) Specifically, he described feeling "sadness" and "no motivation" but denied suicidal ideation. (AR 338.) He declined counseling or medication at that time. (AR 340.) At a follow-up appointment with Dr. Yamamoto in November 2014, he described feeling "[s]tressed" about caring for his mother and continued to report feelings of sadness and lack of motivation. (AR 335.) He continued to decline medication but agreed to a referral to counseling. (AR 337.) In December 2014, Dr. Yamamoto indicated "[d]ecreased depression symptoms." (AR 332.)

On October 27, 2015, Mr. Florez saw PA Sokolowski for treatment of pain in his left foot. (AR 320.) Because Mr. Florez "scored high on his depression screen" (AR 320), PA Sokolowski discussed Mr. Florez's depression with him. (AR 321.) PA Sokolowski noted,

> As soon as we bring this up[,] he is very tearful. His father passed away 5 years ago[,] and he used to work with his father and so this has been very hard on him recently as he has been out of work and bring up old memories of his dad. He lives at home with his mother and so he can take care of her. He is feeling very helpless right now since he is not working.

(AR 321.) She also noted that Mr. Florez stated that he "doesn't even feel like getting out of the house much." (AR 321.) PA Sokolowski diagnosed Mr. Florez with depression and prescribed a low-dose antidepressant, which Mr. Florez agreed to take. (AR 321.)

Two days later at his establishment appointment at the Pain and Spine Clinic, Mr. Florez reported having "poor sleep due to chronic depression," and his affect was documented as "depression." (AR 433.) In completing the depression screening portion of his patient health questionnaire (PHQ-9), Mr. Florez indicated that during the previous two weeks, he (1) had "little interest or pleasure in doing things" and was "feeling down, depressed, or hopeless" nearly every day; (2) had difficulty falling or staying asleep or sleeping too much, felt tired or had little energy, and had trouble concentrating more than half the days; and (3) had a poor appetite or was overeating and felt bad about himself several days. (AR 486-87.) His PHQ-9 score was fourteen (14), indicating moderate depression.[3] (AR 487.)

At a follow up with PA Sokolowski in December 2015, Mr. Florez reported that he was "not sure" if the antidepressant was working but also that he had been forgetting to take it daily. (AR 319.) PA Sokolowki observed that Mr. Florez "appears to be a little better today" and recommended to him that he take his antidepressant daily to increase its effectiveness. (AR 319.) Mr. Florez continued to decline counseling. (AR 319.)

At his February 2016[4] follow-up appointment at the Pain and Spine Clinic, Mr. Florez reported in his PHQ-9 that he not only continued to have "little interest or pleasure in doing things"

---

[3] *See* Kurt Kroenke, M.D., *et al.*, *The PHQ-9: Validity of a Brief Depression Severity Measure*, J. Gen. Intern. Med. 16, 606-613, Table 2 (2001), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1495268/ (last visited May 22, 2020) (providing that a PHQ-9 score of 10-14 indicates a level of depression severity of "Moderate").

[4] The Court acknowledges that Mr. Florez's DLI was December 31, 2015. However, the mere fact that evidence dates from after a claimant's DLI does not necessarily affect its relevance. As the Tenth Circuit has explained, "evidence bearing upon an applicant's condition subsequent to the date upon which the earning requirement was last met is pertinent evidence in that it may disclose the severity and continuity of impairments existing before the earning requirement date[.]" *Baca v. Dep't of Health & Human Servs.*, 5 F.3d 476, 479 (10th Cir. 1993) (alteration, quotation

and was "feeling down, depressed, or hopeless" every day but also was having difficulty sleeping and concentrating every day rather than more than half the days. (*Compare* AR 486, *with* AR 530.) He also indicated an increase in "[p]oor appetite or overeating," from several days in October 2015 to more than half the days in February 2016. (*Id.*) Mr. Florez's total PHQ-9 score in February 2016 increased to seventeen (17), indicating moderately severe depression.[5] (AR 531.) When Mr. Florez was seen at Presbyterian Heart Group on March 18, 2016 to be evaluated for a possible heart murmur (AR 428-29), his "Psychiatric/Behavioral" symptoms were noted as "Positive for depression. Patient has insomnia. The patient is not nervous/anxious." (AR 430 (emphasis omitted).)

On June 28, 2016, Mr. Florez reported to PA Sokolowski that he had gone to Colorado "and couldn't be around anybody." (AR 378.) PA Sokolowski noted, "He finds himself secluding himself. No [suicidal ideation] or [homicidal ideation]. He has a lot of stress from being the caretaker for his mother." (AR 378.) She indicated in her treatment notes that Mr. Florez was not taking his antidepressant and was "still pretty depressed, very tearful[.]" (AR 379.) Mr. Florez agreed to see a counselor at that time, and PA Sokolowski indicated she would follow up with him in a month to determine whether to restart his antidepressant medication. (AR 379)

Three days later, Mr. Florez met with counselor Yvonne Moghadam, LMHC. (AR 351; *see* AR 879-80 (indicating LMHC Moghadam's credentials).) LMHC Moghadam described Mr. Florez's mood as "despondent" and noted that his "facial/emotional expressions are tearful." (AR 350.) In documenting the reason for Mr. Florez's session, she stated, "Patient is primary caregiver

---

marks, and citation omitted). Indeed, as the ALJ recognized, "What was going on [at the] end of [20]15, early [20]16 is very relevant." (AR 040.) He specifically asked Mr. Florez to describe "what problems you were having that you believe prevent you from working on a full-time basis" not only at the end of 2015 but also "within three or four months of" December 31, 2015. (AR 044.)

[5] *See supra* note 3 (providing that a PHQ-9 score of 15-19 indicates a level of depression severity of "Moderately severe").

of his mother and his decease[d] father. Patient's father has been deceased for 5 years now. Patient is fearful of [his] mother being [alone] and the pressure and burden has taken ahold of him." (AR 350.) LMHC Moghadam diagnosed Mr. Florez with severe major depressive disorder and generalized anxiety disorder and indicated that Mr. Florez would call to schedule a follow-up appoint "if he decides to return." (AR 350.)

On July 28, 2016, Mr. Florez reported to PA Sokolowski that he "thinks his depression is getting better" and that "he is having more good days." (AR 347.) He also questioned whether he would continue with counseling, indicating that "[h]e thinks that he just doesn't like being around people in general." (AR 347.) PA Sokolowski restarted Mr. Florez on an antidepressant. (AR 349.) In January 2017, she switched him to a different antidepressant when he "scored very high on his depression screen" and complained that the antidepressant he had been on made him feel bloated, which caused him to stop taking it. (AR 705.)

**Medical Opinions of Record**

State Agency consultants Cathy Simutis, Ph.D., and Sheri Tomak, Psy.D., reviewed Mr. Florez's DIB claim at the initial and reconsideration levels in October 2016 and March 2017, respectively. (AR 062-63, 076-77.) Dr. Simutis found there to be "[n]o mental medically determinable impairments established" and "insufficient evidence to assess the case[.]" (AR 062.) Her psychiatric review technique explanation summarized Mr. Florez's August 2016 function report and certain medical records from 2014-2016 but did not mention that PA Sokolowski diagnosed Mr. Florez with depression in October 2015 and began treating him with antidepressants that same month. At reconsideration, Dr. Tomak found "Depressive, Bipolar and Related Disorders" to be a medically determinable, although secondary and non-severe, impairment supported by the record. (AR 076.)  Like Dr. Simutis, Dr. Tomak found that "[t]he available

evidence remains insufficient to rate psych signs, s[ymptoms,] and functioning from AOD-DLI." (AR 077.)

At the request of Mr. Florez's attorney, consultative examiner Eligio Padilla, Ph.D., conducted a psychological evaluation of Mr. Florez in March 2018. (AR 860-69.) In doing so, Dr. Padilla reviewed Mr. Florez's medical records, interviewed Mr. Florez, administered a battery of psychological and intelligence tests, and completed a mental status examination. (AR 860.) He diagnosed Mr. Florez with severe, recurrent major depressive disorder and provisionally diagnosed him with a learning disorder (not otherwise specified) based on his full-scale IQ of 83 (indicating low average range of intellectual functioning) and his "very low" reading and spelling test scores. (AR 869.) Regarding his depression diagnosis, Dr. Padilla opined in relevant part that Mr. Florez's "depression goes back at least a decade" and "has worsened as the consequence of additional stressors in his life." (AR 868.) Dr. Padilla indicated that "distal causes" of Mr. Florez's depression were "alienation from his son, the death of his father[,] and his loss of employment" and that "[m]ore proximate causal factors include his deteriorating medical and physical condition." (AR 868.) In addition to preparing a psychological evaluation report that summarized his review of medical records, test results, and clinical impressions and diagnoses (AR 860-69), Dr. Padilla completed a Medical Assessment of Ability to do Work-Related Activities (Mental) ("medical source statement") in which he offered opinions on Mr. Florez's work-related mental functional limitations. (AR 856-57.) Asked to "consider the patient's medical history and the chronicity of findings as from before December 31, 2015 to current examination[,]" Dr. Padilla opined that Mr. Florez has "moderate" or "marked" limitations in thirteen of the twenty specific functional areas assessed. (AR 856-57.)

**Mr. Florez's Hearing and the ALJ's Decision**

At his administrative hearing before administrative law judge ("ALJ") Cole Gerstner in June 2018, Mr. Florez testified that the primary reason he stopped working in 2015 was his lower back pain, which caused him to be unable to hang drywall and do the work of a journeyman. (AR 044, 051.) It was difficult to walk and carry tools, and the stiffness made it difficult for him to stand up from a seated position. (*Id.*) Asked by the ALJ why he "couldn't . . . have gotten a job sitting in a chair answering the phone[,]" Mr. Florez responded, "The sitting down, my back and I don't have people skills to talk to people, I get frustrated." (AR 051.) Asked by the ALJ what frustrates him, Mr. Florez answered, "Trying to explain and they don't understand and to me I believe I'm explaining things clearly, it just irritates me. Sometimes I say, well I start yelling." (AR 051-52.)

The ALJ found that as of his DLI, Mr. Florez's degenerative disc disease and diabetes were "severe impairments" but that his other conditions, including depression and learning disorder, were "not severe impairments as they no more than minimally affected the claimant's ability to perform work-related activities through the date last insured." (AR 014.) In assessing Mr. Florez's residual functional capacity ("RFC"), the ALJ found that in addition to having various physical functional limitations caused by his physical impairments, Mr. Florez was limited to "simple, routine tasks with simple work-related decisions and occasional interaction with supervisors, co-workers, and the public." (AR 017.) The ALJ explained that he assessed the foregoing mental limitations to "address[] any benefit of the doubt" based on Mr. Florez's "complaints of pain and difficulty around others, as well as his non-severe learning disorder[.]" (AR 020, 021.) Regarding the medical opinions of record, he accorded "great weight" to the opinions of "the State Agency medical consultants" and "little weight" to Dr. Padilla's opinions. (AR 020, 021.) The ALJ found that "given the claimant's limited treatment, limited clinical findings upon examination, and

activities of daily living including caring for his mother, driving, cleaning, and shopping during the relevant period, . . . no further restrictions are warranted." (AR 020.)

Although the ALJ found that Mr. Florez could not perform his past relevant work given the RFC he assessed (AR 021-22), he found that Mr. Florez would be able to perform other jobs that exist in significant numbers in the national economy, specifically janitor, hand packager, and medical services housekeeper. (AR 022-23; *see also* AR 053-54 (testimony of vocational expert Nicole King).) He therefore found that Mr. Florez was "not disabled." (AR 023.) Mr. Florez sought review by the Appeals Council, which denied his request. (AR 001-6, 182.) Mr. Florez then appealed to this Court. (Doc. 1.)

## II.  Standard of Review

Judicial review of the Commissioner's denial of disability benefits is limited to whether the final decision is supported by substantial evidence and whether the Commissioner applied the correct legal standards to evaluate the evidence.  42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004). In making these determinations, the Court must meticulously examine the entire record but may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007).  In other words, the Court does not reexamine the issues de novo.  *Sisco v. U.S. Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993).  The Court will not disturb the Commissioner's final decision if it correctly applies legal standards and is based on substantial evidence in the record.

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004) (quotation marks omitted).  Substantial evidence is "more than a scintilla, but less than a preponderance."  *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).  A decision "is not based

9

on substantial evidence if it is overwhelmed by other evidence in the record[,]" *Langley*, 373 F.3d at 1118 (quotation marks omitted), or "constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). The Court's examination of the record as a whole must include "anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005).

## III. Discussion

Mr. Florez argues that the ALJ erred in his handling of Dr. Padilla's opinions and further erred by failing to develop the record to clarify ambiguities surrounding the extent of Mr. Florez's mental impairments prior to his DLI. (Doc. 21 at 11-23.) The Commissioner counters that the ALJ reasonably weighed Dr. Padilla's opinions and had no duty to further develop the record. (Doc. 24 at 11-20.) He additionally argues that the ALJ's decision is supported by substantial evidence and should therefore be affirmed. (Doc. 24 at 8-11.) For the following reasons, the Court agrees that the ALJ committed legal error in his handling of Dr. Padilla's opinions and that remand is required.

### A.   Applicable Law

"[W]hen assessing a plaintiff's RFC, an ALJ must explain what weight is assigned to each opinion and why." *Silva v. Colvin*, 203 F. Supp. 3d 1153, 1157 (D.N.M. 2016). The ALJ should generally accord more weight to the opinion of a source who has examined the claimant than to the opinion of a source who has rendered an opinion based on a review of medical records alone. *See* 20 C.F.R. § 404.1527(c)(1)[6]; *Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012) ("[A]n examining medical-source opinion is . . . given particular consideration: it is presumptively

---

[6] The SSA has issued new regulations regarding the evaluation of medical source opinions for claims filed on or after March 27, 2017. *See* "Revisions to Rules Regarding the Evaluation of Medical Evidence," 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017); 20 C.F.R. §§ 404.1520c and 404.1527. Because Mr. Florez filed his claim in 2016, the previous regulations still apply to this matter. *Id.*

entitled to more weight than a doctor's opinion derived from a review of the medical record."); *cf.* *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004) ("The opinion of an examining physician is generally entitled to less weight than that of a treating physician, and the opinion of an agency physician who has never seen the claimant is entitled to the least weight of all."). Indeed, "[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." SSR 96-9p, 1996 WL 374180, at *2 (July 2, 1996). "[T]he opinions of State agency medical . . . consultants . . . can be given weight only insofar as they are supported by evidence in the case record, considering such factors as the supportability of the opinion in the evidence including any evidence received at the administrative law judge and Appeals Council levels that was not before the State agency[.]" *Id.*

Generally, medical opinions must be weighed using the factors set forth in 20 C.F.R. § 404.1527(c), comprising (1) examining relationship, (2) treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors. To be sure, "[n]ot every factor for weighing opinion evidence will apply in every case," SSR 06-03p, 2006 WL 2329939, at *5 (Aug. 9, 2006)[7], and the ALJ is not required to "apply expressly each of the six relevant factors in deciding what weight to give a medical opinion." *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007). Rather, what is required is that the ALJ provide good reasons for the weight he gives an opinion and that his explanation is sufficiently specific to make it clear to any subsequent reviewers the weight given to an opinion and the reasons for that weight. *See id.*

"If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p, 1996 WL 374184, at *7 (July 2,

---

[7] The Court acknowledges that certain Social Security Rulings, including SSR 06-03p, that the Court relies on in its analysis have been rescinded effective for claims filed on or after March 27, 2017. *See* SSR 96-2p, 2017 WL 3928298, at *1 (Mar. 27, 2017). However, as noted above, Mr. Florez filed his claim for DIB in 2016, meaning the rescinded rulings and case law interpreting them are still applicable.

1996). The ALJ must consider "all relevant evidence in the case record" in making a disability determination. SSR 06-03p, 2006 WL 2329939, at *4. Although an ALJ is not required to discuss every piece of evidence, "[t]he record must demonstrate that the ALJ considered all of the evidence[.]" *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). The ALJ must discuss not only the evidence supporting his decision but also "the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Id.* at 1010. An ALJ's failure to set forth adequate reasons explaining why a medical opinion was rejected or assigned a particular weight and demonstrate that he has applied the correct legal standards in evaluating the evidence constitutes reversible error. *See Reyes v. Bowen*, 845 F.2d 242, 244 (10th Cir. 1988) (explaining that the failure to follow the "specific rules of law that must be followed in weighing particular types of evidence in disability cases . . . constitutes reversible error").

**B.**     **The ALJ's decision fails to demonstrate application of the correct legal standards for weighing Dr. Padilla's opinions regarding Mr. Florez's functional limitations.**

Between his narrative report and medical source statement, Dr. Padilla offered medical opinions covering everything from diagnoses and a prognosis to functional limitations. He diagnosed "Major Depressive Disorder" and "Learning Disorder NOS" and offered a prognosis of "guarded" in his narrative report. (AR 868-69.) Regarding functional limitations, Dr. Padilla specifically opined in his medical source statement that Mr. Florez had marked limitations in numerous areas of mental functioning, including his ability to (1) understand and remember detailed instructions, (2) maintain attention and concentration for extended periods of time, (3) complete a normal workday and workweek without interruptions from psychological based symptoms and to perform at a consistent pace without unreasonable number and length of rest periods, and (4) get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (AR 856-57.) He additionally opined that Mr. Florez was moderately limited

12

in his ability to, *inter alia*, (1) perform activities within a schedule, maintain regular attendance and be punctual within customary tolerance, and (2) accept instructions and respond appropriately to criticism from supervisors. (*Id.*)

To support according "little weight" to Dr. Padilla's opinions, the ALJ was required to (1) demonstrate consideration of all of the applicable regulatory factors for weighing medical opinions, and (2) provide "specific, legitimate reasons" for rejecting Dr. Padilla's opinions.[8] *See* 20 C.F.R. § 404.1527(c); *Chapo*, 682 F.3d at 1291 (explaining that dismissal or discounting of an examining source's opinions must be "based on an evaluation of all of the factors set out in [20 C.F.R. § 404.1527(c)] and the ALJ must provide specific, legitimate reasons for rejecting [such opinions]" (quotation marks omitted)). His decision does neither.

Regarding the regulatory factors for weighing medical opinions, the ALJ's decision plainly fails to demonstrate that he properly considered and applied the relevant factors. After summarizing Dr. Padilla's opinions, the ALJ provided the following explanation of the weight he was according Dr. Padilla's opinions and the reasons for that weight:

> Following review, the undersigned accords [Dr. Padilla's] opinions and findings little weight for the period from May 15, 2015, the claimant's amended alleged onset date, through December 31, 2015, the date last insured. Dr. Padilla's findings in March 2018 are inconsistent with the claimant's limited history of treatment during the relevant time period as well as the generally unremarkable clinical findings upon examination, as detailed above. Moreover, the record reveals that prior to the claimant's date last insured, the claimant was the caretaker for his mother and engaged in activities of daily living including driving, shopping, and cleaning, which necessarily require functioning at greater levels than those found

---

[8] The ALJ treated all of Dr. Padilla's findings and opinions in blanket fashion, drawing no distinction between the various opinions Dr. Padilla rendered. Notably, despite that he accorded Dr. Padilla's "opinions and findings little weight[,]" the ALJ in fact agreed with at least some of Dr. Padilla's findings. For example, the ALJ's limitation of Mr. Florez to "simple, routine tasks with simple work-related decisions" is consistent with Dr. Padilla's findings that Mr. Florez had a marked limitation in his ability to understand and remember detailed instructions but only a slight limitation in his ability to make simple work-related decisions. (AR 856.) And his limitation of Mr. Florez to "occasional interaction with supervisors" is consistent with Dr. Padilla's finding that Mr. Florez has a moderate limitation in his ability to accept instructions and respond appropriately to criticism from supervisors. (AR 857.) The consistency between certain of the limitations that Dr. Padilla found and that the ALJ assessed tends to undermine the ALJ's explanation of why he discounted Dr. Padilla's findings.

by Dr. Padilla. This was a one[-]time evaluation over two years after the date last insured from a non[-]treating source.

(AR 021.) Critically, absent from the ALJ's decision is any indication that he considered (1) Dr. Padilla's status as an examining source, (2) the explanations Dr. Padilla provided and the evidence he cited in support of his explanations, (3) Dr. Padilla's specialization and commensurate expertise, and (4) his familiarity with the SSA's disability programs and their evidentiary requirements.

The fact that Dr. Padilla examined Mr. Florez should have entitled his opinions to not only "more weight" in general, *see* 20 C.F.R. § 404.1527(c)(1) ("Generally, we give more weight to the medical opinion of a source who has examined you than to the medical opinion of a medical source who has not examined you."), but also presumptively greater weight than that accorded to the non-examining State Agency consultants. *See Chapo*, 682 F.3d at 1291. Additionally, Dr. Padilla administered numerous diagnostic tests, reviewed Mr. Florez's medical records and function reports, interviewed Mr. Florez and gained a picture of Mr. Florez's family, marital, educational, employment, legal, medical, substance abuse, and psychiatric history, and explained his clinical impressions and diagnoses—as well as the mental functional limitations he assessed—in light of the foregoing. (AR 856, 860-69.) Ordinarily, this should have entitled Dr. Padilla's opinions to "more weight" as well. *See* 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion."). Furthermore, and critically on the record in this case, at the time Dr. Padilla performed his consultative evaluation of Mr. Florez, he had forty-three years of experience as a clinical psychologist and had conducted more than 7,000 evaluations for Disability Determination Services in the previous twenty years. (AR 868.) Dr. Padilla's specialization and familiarity with disability programs presumably should have entitled his

14

opinions to more weight still. *See* 20 C.F.R. § 404.1527(c)(5) ("We generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist."), (c)(6) (providing that "the amount of understanding of our disability programs and their evidentiary requirements that a medical source has . . . and the extent to which a medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding what weight to give to a medical opinion"). Yet the ALJ's decision neither demonstrates proper consideration of the foregoing factors nor offers any reasons—much less good reasons—explaining why he rejected Dr. Padilla's opinions and accorded greater weight to the opinions of non-examining medical sources than to Dr. Padilla's.[9] This alone necessitates remand because the Court cannot say that the ALJ applied the correct legal standards for weighing Dr. Padilla's opinions.

Moreover, regarding the two regulatory factors the ALJ appears to have actually considered—treatment relationship and consistency—the ALJ's decision renders evident that he

---

[9] While not an issue raised on appeal or a basis for the Court's decision, the Court is troubled by the ALJ's handling of the State Agency consultants' medical opinions, particularly vis-à-vis his rejection of Dr. Padilla's. The ALJ's explanation of the "great weight" he accorded to the State Agency consultants' opinions consists of the following one-sentence, generic, conclusory statement: "The undersigned accords great weight to the medical opinions of the State Agency medical consultants as their findings are well supported by the weight of the evidence of record: See Exhibits 2A and 5A." The deficiencies of this explanation abound. First, it plainly fails to demonstrate consideration of the regulatory factors to be used in determining what weight to give an opinion by providing good reasons for the weight accorded. *See* 20 C.F.R. § 404.1527(c); *Oldham*, 509 F.3d at 1258. It also fails to evince application of the "more rigorous test" and compliance with the "stricter standards" for weighing the opinions of a non-examining source. *See* SSR 96-6p, 1996 WL 374180, at *2. Next, the record contains findings of three different State Agency consultants, and each consultant's "opinion" in fact encompassed numerous medical opinions addressing discrete issues, such as the severity of Mr. Florez's medically determinable impairments and functional limitations. (*See* AR 059-67, 072-82.) The ALJ's decision nowhere distinguishes between the different State Agency consultants, much less the distinct opinions each rendered, and his conclusory explanation of the blanket weight he accorded *all* of their opinions is inadequate to support his elevation of their opinions over Dr. Padilla's. Finally, the ALJ failed to reconcile a material conflict in the opinions of Dr. Simutis and Dr. Tomak. Dr. Simutis found that the record established "[n]o mental medically determinable impairments" while Dr. Tomak found there to be sufficient evidence to support a finding of Depressive, Bipolar and Related Disorders as a medically determinable mental impairment, albeit a secondary and non-severe one. The Court fails to see—and the ALJ failed to explain—how "great weight" could be accorded to each of these opinions, which reached opposite conclusions. The Court identifies these issues in hopes of forestalling further error when this case is reviewed on remand.

failed to *properly* consider those factors. Additionally, the reasons he gave for discounting Dr. Padilla's opinions are neither specific nor legitimate. The Court explains.

## 1. <u>Treatment Relationship</u>

The Court begins by addressing the ALJ's apparent consideration and application of the "[t]reatment relationship" factor. *See* 20 C.F.R. § 404.1527(c)(2) (providing that "more weight" is generally given to the opinions of treating sources and identifying subfactors, comprising length of the treatment relationship, frequency of examination, and nature and extent of the treatment relationship, that are considered in determining how much weight to accord a treating source's opinions). The ALJ discounted Dr. Padilla's opinions because Dr. Padilla was a non-treating source who evaluated Mr. Florez only once more than two years after Mr. Florez's DLI. This reason in fact encompasses three sub-reasons—(1) non-treating source, (2) one-time evaluation, and (3) two years after DLI—none of which, alone or in combination, is a legitimate basis for rejecting Dr. Padilla's opinions.

First, while the Regulations provide that "[g]enerally, we give more weight to medical opinions from your treating source," 20 C.F.R. § 404.1527(c)(2), that does not mean that a non-treating source's opinions may be discounted or rejected merely because the source does not have a treatment relationship with the claimant. A source's treatment relationship with the claimant is but one factor to be considered and may not be applicable in every case. *See* 20 C.F.R. § 404.1527(c)(1)-(6); SSR 06-03p, 2006 WL 2329939, at *5. While Dr. Padilla's status as a non-treating source may be a proper basis for refusing to accord his opinions "more" or controlling

weight, it is not a proper basis for discounting—much less rejecting—his opinions, particularly on this record, which contains no opinions from treating sources.[10] *See Chapo*, 682 F.3d at 1291.

Second, the fact that Dr. Padilla examined Mr. Florez only once is neither here nor there. The frequency of examination is a relevant consideration in determining the weight to accord a *treating* source's opinions, *see* 20 C.F.R. § 404.1527(c)(2)(i) (providing that "the more times you have been seen *by a treating source*, the more weight we will give to the source's medical opinion" (emphasis added)), but Dr. Padilla—a consultative examiner—was not a treating source as just established. *See* 20 C.F.R. § 404.1527(a)(2) (describing who qualifies as a "treating source" and providing that "if [the claimant's] relationship with the source is not based on your medical need for treatment or evaluation, but solely on [the claimant's] need to obtain a report in support of your claim for disability[,]" that source is considered a "non[-]treating source"). Indeed, the very nature of Dr. Padilla's involvement in this case tends to presuppose a limited relationship between source and claimant and is not, itself, a basis for discounting Dr. Padilla's opinions. *See Chapo*, 682 F.3d at 1291 (noting that while it may be valid not to accord controlling weight to the opinions of a source who has a limited relationship with a claimant, a limited relationship "is not by itself a basis for rejecting [the source's opinions]—otherwise the opinions of consultative examiners would essentially be worthless, when in fact they are often fully relied on as the dispositive basis for RFC findings"). The Court fails to see—and the ALJ failed to explain—how Dr. Padilla's limited relationship with Mr. Florez, comprised of a one-time examination, justifies the ALJ's rejection of Dr. Padilla's opinions.

---

[10] The ALJ's reliance on Dr. Padilla's status as a non-treating source as a basis for discounting his opinions is particularly dubious given that he accorded "great weight" to the opinions of the non-treating, non-examining State Agency consultants.

Third, the remoteness of Dr. Padilla's evaluation and assessment vis-à-vis Mr. Florez's DLI is not an enumerated factor to be considered in weighing medical opinions. *See* 20 C.F.R. § 4040.1527(c)(1)-(5). To the extent it could qualify as an "other factor," *see* 20 C.F.R. § 404.1527(c)(6) (providing that "we will also consider any factors . . . of which we are aware, which tend to support or contradict the medical opinion"), the ALJ failed to offer any explanation to support discounting Dr. Padilla's opinions on that basis. That is particularly problematic on the record in this case, which, as discussed above, indicates that Dr. Padilla, given his specialization and understanding of the SSA's disability programs, was perhaps uniquely qualified to render remote opinions regarding Mr. Florez's mental functional limitations where the developed record contained "insufficient evidence" to allow the State Agency consultants to make such assessments. *See* 20 C.F.R. §§ 404.1519a-1519b (discussing when the SSA will and will not purchase a consultative examination), 404.1520b(b)(2) (providing that if the evidence of record is consistent but insufficient to determine disability, one option available is to require the claimant to undergo a consultative examination). In any event, the ALJ's failure to explain why the timing of Dr. Padilla's evaluation justified his wholesale rejection of Dr. Padilla's opinions renders this reason, like the others, inadequate. Indeed, the ALJ's very reliance on the treatment-relationship factor— inapposite on its face—as a basis for discounting Dr. Padilla's opinions further evinces that he failed to apply the correct legal standards for weighing Dr. Padilla's opinions.

## 2. **Consistency**

Regarding the other reasons the ALJ gave, the Court understands the ALJ to have discounted Dr. Padilla's opinions based on their purported inconsistency with the other evidence of record. Consistency of opinions with the record as a whole is an important factor to consider in weighing medical opinions. *See* 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent a

medical opinion is *with the record as a whole*, the more weight we will give to that medical opinion." (emphasis added)). But the ALJ's decision fails to demonstrate that he properly applied this factor in deciding what weight to accord Dr. Padilla's opinions. Specifically, the ALJ's decision evinces no consideration of significantly probative evidence relating to Mr. Florez's mental impairments in the relevant period of late 2015 to early 2016, including (1) that PA Sokolowski diagnosed Mr. Florez with depression and placed him on an antidepressant in October 2015 because he "scored high on his depression screen" (AR 320-21); (2) Mr. Florez's report to PA Sokolowski in October 2015 that he "doesn't even feel like getting out of the house much" (AR 321); (3) the PHQ-9 scores from Mr. Florez's depression screenings when he was seen at the Pain and Spine Center indicating that he was suffering from "moderate depression" in October 2015 that had worsened to "moderately severe depression" by February 2016 (AR 487, 531); (4) numerous medical providers' observations shortly before and after Mr. Florez's DLI that Mr. Florez exhibited signs of depression (AR 321, 341, 350, 379, 430); and (5) Mr. Florez's July 2016 function report, in which he reported that he had little interest in hobbies and social activities because he would get "frustrated" and felt "depress[ed]," felt "nervous around people" and therefore kept to himself, and had difficulty getting along with others because of his anger (AR 212-13). While not required to expressly discuss each of the foregoing pieces of evidence, the ALJ's decision was required to at least demonstrate consideration of it if he was going to reject Dr. Padilla's opinions based on their alleged inconsistency with the record.

Moreover, even assuming the ALJ properly disregarded the foregoing evidence in considering whether Dr. Padilla's opinions were consistent with the other evidence of record, the ALJ's finding that Dr. Padilla's opinions were inconsistent with the record is not supported by substantial evidence. First, the ALJ failed to explain not only what he meant by "limited history

of treatment during the relevant time period" but also the relevance of such evidence vis-à-vis the question of the weight that should be accorded to the specific mental functional limitations that Dr. Padilla assessed. The fact that Mr. Florez—a depressed man who had lost his job, was dealing with chronic back pain, was caring for his widowed mother, and gets nervous around people—was not going to counseling on a weekly basis after being diagnosed with depression is hardly substantial evidence that supports finding *all* of Dr. Padilla's opinions to be inconsistent with the record such that they can be rejected in their entirety. To the extent that Mr. Florez's failure to seek more extensive treatment could support the ALJ's discounting of Dr. Padilla's opinions, the ALJ's failure to explain that basis renders it insufficient to support his finding of inconsistency. *See Musgrave*, 966 F.2d at 1374 ("Evidence is not substantial if it . . . constitutes mere conclusion.").

Second, the ALJ's finding that Dr. Padilla's findings were "inconsistent with . . . the generally unremarkable clinical findings upon examination, as detailed above[,]" is similarly not supported by substantial evidence. The ALJ's explanation in support of the RFC he assessed contains no discussion whatsoever of any "clinical findings" related to Mr. Florez's alleged mental impairments, only his physical impairments. (*See* AR 017-21.) The only discernible reference made to any "clinical findings" related to Mr. Florez's mental impairments is found in the ALJ's step-two discussion regarding the severity of Mr. Florez's alleged impairments. There, in concluding that Mr. Florez's alleged mental impairments were non-severe, the ALJ noted that the treatment record from Mr. Florez's visit to PA Sokolowski on December 14, 2015 indicated that his "psychiatric examination was unremarkable and the claimant was noted to be relaxed, cooperative, and appropriate." (AR 015; *see* AR 319.) But Mr. Florez's treatment record from his immediately prior visit on October 27, 2015—the day Mr. Florez "scored high on his depression

20

screen," was diagnosed with depression, and began taking an antidepressant—also indicated that Mr. Florez was "relaxed and appropriate" and "[c]ooperative." (AR 321.) The ALJ's unexplained, unsupported statement regarding what the "clinical findings" of record show fails to supply substantial evidence to support his finding that Dr. Padilla's findings were inconsistent with the evidence of record.

Finally, the ALJ's conclusory finding that Mr. Florez's activities of daily living and role as his mother's caretaker "necessarily require functioning at greater levels than those found by Dr. Padilla" also fails to support his rejection of Dr. Padilla's opinions. Initially, the record contains little information regarding what Mr. Florez's "caretaker" role involved. Mr. Florez testified that he lives with his mother and that he "help[s] take care of her." (AR 046.) The only specific "caretaking" activity mentioned in the record is that Mr. Florez drives his mother to appointments. (AR 209, 245.) Notably, in Mr. Florez's function reports, he indicated that his mother assists *him* with taking care of his dog and does all the cooking. (AR 209-10, 245-46.) And numerous medical providers documented that caring for his mother was, in fact, a source of stress for Mr. Florez. (AR 335, 341, 350, 378.) The ALJ provided no explanation of how the evidence related to Mr. Florez's caretaking of his mother justifies his rejection of the functional limitations Dr. Padilla assessed. The ALJ's decision also fails to explain how evidence that Mr. Florez could drive, go shopping for food and household items for no more than an hour at a time, and clean around his mother's house supports rejecting all of Dr. Padilla's opinions. Given that RFC assessment is based on a person's "ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule)[,]" SSR 96-8p, 1996 WL 374184, at *7, there is nothing inherently inconsistent between the activities of daily living the ALJ cited and the mental *work-related* functional limitations Dr. Padilla assessed.

While not required to adopt any or all of the functional limitations Dr. Padilla assessed, the ALJ was not free reject them without demonstrating that he had considered the relevant regulatory factors in weighing Dr. Padilla's opinions and providing specific, legitimate reasons for rejecting those he chose not to adopt. Because the ALJ's decision fails to evince application of the correct legal standards for considering the evidence and weighing the medical opinions of record regarding Mr. Florez's mental functional limitations, remand is required.

**C.      The Court Does Not Reach Mr. Florez's Other Argument**

Because the Court concludes that remand is required as set forth above, the Court will not address Mr. Florez's remaining claim of error. *See Wilson v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003) (explaining that the reviewing court does not reach issues that may be affected on remand).

### IV.   <u>CONCLUSION</u>

For the reasons stated above, Mr. Florez's Motion to Reverse and Remand for Rehearing with Supporting Memorandum (Doc. 21) is GRANTED.

KIRTAN KHALSA
United States Magistrate Judge
Presiding by Consent